**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF NORTH CAROLINA**
**WESTERN DIVISION**
**Civil File No.: 4:23-cv-77**

| | | |
|---|---|---|
| **FORMA AI INC.,** | ) | |
| **Plaintiff,** | ) | **DEFENDANT's MEMORANDUM IN** |
| | ) | **SUPPORT OF ITS PARTIAL MOTION FOR** |
| **v.** | ) | **SUMMARY JUDGMENT ON LIKELIHOOD** |
| | ) | **OF CONFUSION** |
| **TWIC, INC.,** | ) | |
| **Defendants.** | ) | |

Normal businesses reach out to those they have concerns with and try to resolve issues without lawyers. Instead of trying to address any concerns in a reasonable manner, when Plaintiff saw a third party on LinkedIn post an article about Defendant but tag Plaintiff, Plaintiff called its lawyers. Since then, Plaintiff attempted to trump up a case of trademark infringement against Defendant, despite the parties selling non-competitive products that are purchased by sophisticated consumers as part of a sophisticated buying process that occurs through different channels. Plaintiff has not identified a single sale it lost because of Defendant. Plaintiff has not identified a single purchaser who purchased Plaintiff's products and services intending to purchase Defendant's products and services (or vice versa). Instead, Plaintiff relies on a handful of contacts from end users of Defendant's products and services (caused by inaccurate instructions) and from third parties that amount less than a tenth of a percentage of similar communications. There is no likelihood of confusion, and summary judgment finding the same is appropriate.

## STATEMENT OF CASE

Plaintiff brought suit against Defendant for trademark infringement, unfair competition, and false designation of origin under the Lanham Act, unfair competition under California state law, and common law unfair competition. [D.6.] The parties engaged in discovery, which

1

closed at the end of June. Throughout, Defendant has maintained there is no likelihood of confusion. Defendant now timely moves the court for partial summary judgment on the issue of likelihood of confusion.

## STATEMENT OF FACTS

What if a company's employee benefits could be customized to fit the unique individual needs of its employees? Defendant Twic, Inc. developed a software platform and related services to answer that question. Under its FORMA mark, Defendant offers a platform through which a company can provide flexible employee benefits that adapt to every individual, helping them live their best lives, while easing the company's administrative burden and costs. Defendant's platform allows companies to offer Lifestyle Savings Account (LSA) programs, which are accounts funded by employers that an employee may choose to spend however they wish to support their lifestyle within the benefit program guidelines; pre-tax accounts such as Health Savings Accounts (HSAs) and Flexible Spending Accounts (FSAs); and Health Reimbursement Accounts (HRAs), which are accounts funded by the employer that the employee may use to pay for health products or services that are not covered by the company's traditional health insurance plan. [SOF, ¶¶ 1-4.]

Employee benefits are typically sold to companies through employee benefits brokers. The company contracts with employee benefits broker to provide recommendations about what types of employee benefits the company should offer and which employee benefits providers the company should use. Between 70% to 90% of Defendant's sales go through employee benefits brokers. [SOF, ¶¶ 5-8.]

Regardless of whether a sale occurs through a broker channel or through another channel, sales of employee benefits products and services are substantial and time consuming. Defendant

attends multiple meetings with a potential customer, and prepares and presents customized materials to that customer over a period of months.  [SOF, ¶ 10.]

Because of the importance of employee benefits brokers in the sale of employee benefits products and services, Defendant focuses the quantitative majority of its advertising and promotion towards promoting Defendant through the channels used by those brokers.  In particular, employee benefits brokers maintain web portals that are run by the broker community. Brokers use these portals to learn about different types of benefits and benefits providers and prepare recommendations or pitches for the companies the broker serves.  Benefits providers are able to submit information to the portals to describe and promote the products and services that provider offers.  Some portals further allow providers to upload videos or brochures about their products and services.  [SOF, ¶¶ 11, 14-16.]

Defendant also maintains a website through which it promotes its products and services. A user who accesses the website will find their eye immediately pulled to the largest font on the screen, which reads "flexible benefits that" and is followed by a rotating set of phrases describing Defendant's benefits services.  Beside this proclamation is a set of unique character illustrations representing happy employees using their benefits.  The webpage includes Defendant's FORMA logo in small font in the upper left-hand corner of the website navigation bar.  Similar layouts may be found on subpages for various products offered by Defendant.  For example, Defendant's pre-tax products and services are promoted on a page with the large heading "Pre-tax Accounts," which is arranged beside another character illustration, while Defendant's LSA products and services are promoted on a page with the large title "Lifestyle Spending Accounts (LSAs)" beside a set of character illustrations.  The FORMA logo is again contained in a smaller size on the upper left-hand corner of the navigation bar.  [SOF, ¶ 17.]

Defendant utilizes the same brand appearance consistently across all facets of the company.  Defendant's brochures, mobile application, trade show booths, and even some social media posts incorporate Defendant's unique brand, to include the FORMA logo, the emphasis on employee benefits services, and the character illustrations.  [SOF, ¶¶12-13, 16-17, 22, 24-25, 31.]

Originally, Defendant used the name TWIC.  In 2021, Defendant decided to rebrand and hired Landscape, a brand development firm, to help Defendant find a new name.  Landscape presented Defendant with dozens of options.  From the options developed by Landscape, Defendant selected FORMA, along with the logo mark shown below, also developed by Landscape:



In February 2022, Defendant filed an application to register its FORMA logo with the U.S. Patent and Trademark Office ("USPTO").  In early March 2022, Defendant officially rebranded to FORMA.  Defendant updated its website, broker portal materials, social media pages, brochures, and trade show booths with the new brand.  [SOF, ¶¶ 12-13, 16-17. 22, 24-25, 31-35.]

In April 2022, a third party, Medhealth Outlook, made a post on business-centric social media site LinkedIn and attempted to "tag" Defendant.  A "tag" on social media is a link from the post to the social media user's profile who is mentioned in the link.  Although it appeared to intend to tag Defendant, Medhealth Outlook tagged Plaintiff Forma AI Inc.  [SOF, ¶ 68.]

Plaintiff could have sent a message through LinkedIn to Medhealth Outlook to inquire as to the mistake.  Plaintiff could have contacted Defendant directly about any concerns it might have.  Instead, Plaintiff contacted its lawyers and had them use the LinkedIn post to send an aggressive cease and desist letter to Defendant.  [SOF, ¶¶ 69-70.]

Plaintiff sells sales compensation software under the FORMA.AI mark shown below:



[SOF, ¶¶ 37-43, 47.]  Primarily, Plaintiff sells its products and services to large, multinational corporations.  [SOF ¶ 48.]  These sales occur primarily through Plaintiff's website.  [SOF, ¶ 57.] Plaintiff only has twenty three customers in the United States.  [SOF, ¶ 45.]  From 2016 through early 2024, Plaintiff spent less than $5 million advertising its goods and services in the United States; approximately 1/3 of those costs were spent on paying employees as opposed to spending on actual advertising.  [SOF, ¶ 53.]  Plaintiff concedes it has not engaged in widespread use of FORMA.AI.  [SOF, ¶ 55.]

The use Plaintiff does have is in conjunction with other parties who offer HR consulting services or "HR Tech" products and services.  The marks FORMA, FORMA LEADERS, SCIFORMA, DIGIFORMA, and FORMALMS are used for the HR operations of providing employee training services or technology for employee training.  FLOWFORMA is used for HR process automation.  FORMA software for filling in forms can be used to fill in forms that an HR department would use.  FORMA VISION videoconferencing software could be used to conduct employee interviews or virtual training.

When Plaintiff uses FORMA.AI to sell products and services, it is as part of a complex sales process.  Potential customers attend immersion discussions with Plaintiff to allow Plaintiff to learn about the potential customer's organization and its goals.  Plaintiff conducts discovery and analyzes documents.  After listening to the customer and conducting its research, Plaintiff will present a Statement of Work to the potential customer, outlining how Plaintiff can help the potential customer.  Typically, the decision maker in purchasing Plaintiff's products is a company's CEO, CHRO, or CFO.  [SOF, ¶ 58.]

Unsurprisingly, no sophisticated purchaser has been confused and bought Plaintiff's products and services while intending to purchase Defendant's (or vice versa). At most, Plaintiff has identified only 29 occurrences that it asserts are instances of confusion. These incidents primarily consist of emails. Even if all the occurrences identified by Plaintiff were incidents of actual confusion – which they are not – they would amount to 0.007% of just the email communications Defendant receives from third parties. [SOF, ¶¶ 65-88.]

Further, from investigations, Defendant affirmatively discovered that nine of Plaintiff's alleged instances of confusion were not confusion. Defendant previously used the general mailbox support@twic.ai. When Defendant rebranded to FORMA, it purchased the URL www.joinforma.com, causing this address to become support@joinforma.com. Instead of providing the new address to employees, some of Twic's customers did a "cut and paste," changing "twic" to "forma" in benefits documentation.. As a result, employees were told to contact support@forma.ai (an email that directs to Plaintiff). Eight of the incidents occurred this way. The ninth incident involved a social media mistag by someone who knows Defendant and Plaintiff are different. [SOF, ¶¶ 71-74.] At least three other emails appear to also be the result of benefits teams at companies taking old twic email addresses and changing "twic" to "forma." [SOF, ¶¶ 76, 78-79.]

Despite the fact that the parties sell different types of software through different channels of trade, that there have been no purchases as a result of confusion, and that the "confusion" Plaintiff identifies is *de minimis*, Plaintiff continues to litigate this case. No reasonable consumer is likely to be confused between Defendant and Plaintiff. Defendant, therefore, moves for summary judgment.

**ARGUMENT**

**I.      The Summary Judgment Standard & Trademark Infringement**

Summary judgment is appropriate where no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The burden is on the moving party to show summary judgment is appropriate. *Id*.; *Turley v. Costco Wholesale Corp.*, 220 Fed. Appx. 179, 181 (4th Cir. 2007); *Barwick v. Celotex Corp*., 736 F.2d 946, 958 (4th Cir. 1984). This burden may be met by the use of affidavits, exhibits, depositions, and other discovery materials. *Turley*, 220 Fed. Appx. at 181; *Barwick*, 736 F.2d at 958. Once a moving party has met its burden, the opposing party must go forward and produce sufficient evidence to support its own contentions. *Thomas v. Nationwide Mutual Ins. Co*., 47 Fed. Appx. 255, 255 (4th Cir. 2002). Uncontroverted evidence is taken as true. *Wallace v. Texas Tech Univ*., 80 F.3d 1042, 1048 (5th Cir. 1996). However, "[a] mere scintilla of evidence is not enough to create a fact issue; there must be evidence on which a jury might rely." *Barwick*, 736 F.2d at 958-59 (citation omitted); see also *Turley*, 220 Fed. Appx. at 181.

The purpose of summary judgment is to save the time and expense of trial when there is no genuine issue of material fact and additional evidence beyond that available in the motion for summary judgment could not reasonably be expected to change the result. *Pure Gold, Inc. v. Syntex (U.S.A.), Inc*., 739 F.2d 624, 627 (Fed. Cir. 1984). Not every dispute about material facts is genuine. Colorable evidence or evidence not significantly probative does not create a genuine issue of fact. *See Anderson v. Liberty Lobby Inc*., 477 U.S. 242, 249-50 (1986). "Genuineness means that the evidence must create fair doubt; wholly speculative assertions will not suffice. A trial, after all, is not an entitlement. It exists to resolve what reasonable minds would recognize as real factual disputes." *Ross v. Comm'n Satellite Corp*., 759 F.2d 355, 364 (4th Cir. 1985),

7

*abrogated on other grounds by Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989); *see also The News and Observer Publ'g Co. v. Raleigh-Durham Airport Authority*, 597 F.3d 570, 576 (4th Cir. 2010) (to show a genuine issue of material fact, nonmoving party must set out specific facts and may not rely upon allegations or denials in its pleadings). The Court is obligated to prevent factually unsupported claims and defenses from going to trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986); *accord Pure Gold, Inc.*, 739 F.2d at 624.

The ultimate question in determining trademark infringement is whether there exists a likelihood that an appreciable number of purchasers will be misled or simply confused as to the source of the goods and services in question. *Perini Corp. v. Perini Constr., Inc.*, 915 F.2d 121, 127 (4th Cir. 1990); *see also* 15 U.S.C. § 1114. A claimant is not entitled to relief unless it can show this likelihood of confusion. *Pizzeria Uno Corp. v. Temple*, 747 F.2d 1522, 1527 (4th Cir. 1984). "To support a finding of infringement, [a trademark claimant] must show a probability, not just a possibility, of confusion." *New York Stock Exchange, Inc. v. New York, New York Hotel, LLC*, 293 F.3d 550, 554 (2d Cir. 2002). When no reasonable juror could find a likelihood of confusion exists between the parties' marks, summary judgment is appropriate. *CareFirst of Md., Inc. v. First Care, P.C.*, 434 F.3d 263 (4th Cir. 2006).

## II. Even under Plaintiff's theory that the parties' products and services are related, there is not a likelihood that an appreciable number of consumers are or will be confused between Plaintiff and Defendant.

"To determine whether there is a likelihood of confusion," the Fourth Circuit considers: "the strength or distinctiveness of the mark;" "the similarity of the two marks;" "the similarity of the goods/services the marks identify;" "the similarity of the facilities the two parties use in their businesses;" "the similarity of the advertising used by the two parties;" "the defendant's intent;" and "actual confusion." *Pizzeria Uno*, 747 F.2d at 1527.

8

With regard to the third factor, the similarity of the goods and services identified by the marks, the parties dispute whether their respective offerings are related. Plaintiff contends that the market of related products and services is "HR Tech," or "any technology that supports and enables the human resources within a business." [SOF, ¶ 44.] Human resources incorporates recruitment, administration, compensation, benefits, training, and performance management. [SOF, ¶ 93.] Defendant contends that the market of related products and services is "employee benefits" or products and services for employee benefits professionals. While Defendant does not concede its position on this issue, for purposes of this motion, Defendant will treat the relevant market as "HR Tech." Even under Plaintiff's definition of the scope of the market of related goods and services, there is no likelihood of confusion.

**A. FORMA.AI is a weak mark.**

"The first and paramount factor" under the *Pizzeria Uno* test "is the distinctiveness or strength of the two marks." *Pizzeria Uno*, 747 F.2d at 1527. "The strength of a mark is the degree to which a consumer in the relevant population, upon encountering the mark, would associate the mark with a unique source," and "is evaluated in terms of" both "conceptual strength and commercial strength." *Carefirst*, 434 F.2d at 269.

Conceptual strength "focues on the linguistic…'peculiarity' of the mark…considered in relation to the product, service, or collective organization to which the mark attaches." *Id*. Even if a mark is suggestive in its entirety, it does not follow that the mark is conceptually strong. *Grayson O Co. v. Agadir International, LLC*, 856 F.3d 307, 315 (4th Cir. 2017). "'The frequency of prior use in the same field of merchandise or service' illustrates the mark's lack of conceptual strength." *Carefirst*, 434 F.3d at 270 *quoting Pizzeria Uno*, 747 F.2d at 1530-1531. "A strong trademark is one that is rarely used by parties other than the owner of the trademark, while a

weak trademark is one that is often used by other parties." *Carefirst*, 434 F.3d at 270 (internal quotations omitted). "[C]onsumers are unlikely to associate a mark with a unique source if other parties use the mark extensively." *Grayson O,* 856 F.3d at 316.

Commercial strength looks at whether "a substantial number of present or prospective customers understand the designation when used in connection with a business to refer to a particular person or business enterprise." *Id*. (internal quotations omitted). "To evaluate a mark's commercial strength, we consider the owner's advertising expenditures, consumer studies linking the mark to a source, sales success, unsolicited media coverage of the product, attempts to plagiarize the mark, and the length and exclusivity of the mark's use." *Passport Health, LLC v. Avance Health Sys.,* 823 Fed. Appx. 141, 148 (4th Cir. 2020); *see also Grayson O*, 856 F.3d at 316 (same). Of these, consumer study evidence is considered the most "telling," as this evidence is preferred for showing how consumers understand a mark. *George & Co., LLC v. Imagination Entertainment, Ltd.*, 575 F.3d 383, 396 (4th Cir. 2009). "[E]vidence of extensive third-party use also demonstrates that [the] mark lacks commercial strength." *Carefirst,* 434 F.3d at 270; *see also Passport Health,* 823 Fed. Appx. at 148 ("Third-party use also undermines a mark's commercial strength.")

### 1. FORMA.AI identifies features of Plaintiff's products and services.

FORMA.AI is conceptually weak. Plaintiff defines its services in its trademark application as "sales performance consultation in the field of … modeling…programs for sales compensation, segmentation, sales territory design, quota management, revenue productivity, and benchmarking" in Class 35. [SOF, ¶ 37; D.6-2.] Plaintiff markets its product as "the first incentive compensation platform with a scientific model-drive approach." [SOF, ¶ 40.] Its website states "optimize sales planning using insights from Forma.ai's collective data model"

while promoting its financial outcome modeling and analytical modeling capabilities. [D.6-1, pp. 3-4.] At deposition, Plaintiff explained that:

> We've taken an approach where we are leveraging collective data model, what that means, it's a consistent structure data model, where one customer's data is ingested, it is tagged, and mapped to our data model, which means that any sort of request or any sort of configuration leverages pre-existing building blocks to compile that request, making it faster, more efficient, there's no disposable work, every part of it is reusable.

[SOF, ¶ 41.] Plaintiff's services and its software are model-based.

Plaintiff's mark is FORMA.AI. The word "forma" is Latin. One meaning of, *forma* is "model." [SOF, ¶ 63.] Thus, *forma* describes or identifies Plaintiff's services (i.e. modeling services).

The term ".ai," meanwhile, also has a commonly understood meaning. AI is the abbreviation for "artificial intelligence." Tech companies frequently use the top level domain .ai when they wish to "associate themselves with AI technology." [SOF, ¶ 64.] In the Amended Complaint, Plaintiff describes its product as "an artificial intelligence based software platform." [D.6, ¶7.] FORMA.AI therefore identifies two features of Plaintiff's services – the modeling feature and the artificial intelligence feature. Even if there is an argument that the mark in its entirety, FORMA.AI, is suggestive, its component parts are each descriptive as they describe features of Plaintiff's services.[1] The mark FORMA.AI is not conceptually strong.

**2. Third Party Use of "forma" diluties the strength of FORMA.AI in an "HR Tech" market of related products and services.**

In considering the weakness of a mark due to third party uses of a term, courts look at both third-party registrations at the USPTO and third party use in commerce. *See Petro Stopping Ctrs., L.P. v. James River Petroleum, Inc.*, 130 F.3d 88, 93 (4th Cir. 1997) ("the frequency with which a term is used in other trademark registrations is indeed relevant to the distinctiveness

inquiry under the first likelihood of confusion factor.")  With regard to third-party registrations, when a mark is used in many registrations in a particular Class, it is evidence "that some segment of the composite marks which both contesting parties use has a normally understood and well-recognized descriptive or suggestive meaning, leading to the conclusion that segment is relatively weak."  *Petro Stopping*, 130 F.3d at 94 (internal quotations omitted).

Plaintiff contends that the market of related products and services is "HR Tech."  Plaintiff defines this market as "any technology that supports and enables the human resources within a business."  [SOF, ¶ 44.]  There are a number of third party marks that (1) include the string 'forma'; and (2) include a goods and services description that overlaps with HR Tech.  Under USPTO guidelines for examining trademark applications, if a market limitation is not included in a goods and services description, then the description covers all markets.  T.M.E.P. 1207.01(a)(iii) ("If the cited registration describes goods or services broadly, and there is no limitation as to their nature, type, channels of trade, or class of purchasers, it is presumed that the registration encompasses all goods or services of the type described, that they move in all normal channels of trade, and that they are available to all classes of purchasers.").  As there are no market limitations in the following registrations, their use necessarily includes use in the HR Tech field:

- COFORMA, Reg. No. 6277107, for "Research, development, design and upgrading of computer software; Computer services, namely, integration of computer software into multiple systems and networks; Consulting services in the field of providing online, non-downloadable software and applications." (no claimed limitations and therefore applies to HR software)

- DEALFORMA, Reg. No. 5626905, for "Providing business information, namely, commercial corporate and statistical information provided on-line from a computer database or the Internet." (no claimed limitations and therefore applies to HR information)

- INFORMAI, Reg. No. 5772904 for "computer software consulting" (no claimed limitations and therefore applies to HR software consulting)

12

- MYPERFORMA, Reg. No. 5681707, for "software for use in maintaining, collecting, analyzing and interpreting performance metrics and KPI (key performance indicators) of individuals and groups engaged in … employment settings, based on individual responses to survey questions" (no limitations and therefore applies to HR)

- ONEFORMA, Reg. No. 6611137, for computer programs "for use in database management and electronic storage of data" and "for creating searchable databases of information and data," software that "provides real-time, integrated business management intelligence by combining information from various databases and presenting it in an easy-to-understand user interface." (no claimed limitations and therefore applies to HR software for managing HR related data)

- PERFORMA, Reg. No. 7013364, for "software for managers of investment funds for use in financial portfolio management" (breadth captures 401(k), a benefit administered by HR)

- PERFORMA ENTERPRISE, Reg. No. 5855797, for "Downloadable software application for use in mobile video training of police, first responders, and military, on the subject of critical decision making, preparedness, communication tactics, de-escalation, appropriate use of force, cognitive biases, situational awareness, mental illness sensitivity, and law, policies, and procedures" (job training is a function of HR)

- PERFORMA LABS, Reg. No. 6577801, for "Providing temporary use of non-downloadable software for providing client access for secure business document management, namely, searching, organizing, filing, reviewing, and storing documents" (no claimed limitations and therefore applies to software for HR documents)

- PROFORMA PROVISION, Reg. Nos. 6389830, 6389862, 6342218, for "design and development of computer software for the improvement of the business operations of franchisees." (no claimed limitations and therefore applies to software for the improvement of HR business operations of franchisees)

- SAAS PROFORMA, Reg. No. 6286048, for "[SAAS] services featuring software for creating financial projections and managing, reporting, and scaling financial reports." (no claimed limitations and therefore applies to HR software for financial reports, which could be used for determining sales compensation)

- SCIFORMA, Reg. No. 2862807, for "computer programs…that enable companies to develop project plans for enhancing resource utilization for use [in] … business management and instructional manuals sold together as a unit" (no claimed limitations and therefore applies to computer programs for HR management)

- TANSFORMAI, Reg. No. 5781496, for "computer software consulting" (no claimed limitations and therefore applies to HR software consulting)

13

A review of Class 42 more generally reveals more than 25 registrations or allowed applications that include FORMA.  [SOF, ¶ 90.]

Plaintiff also offers business consultation services and business collaboration services under its FORMA.AI mark.  [D.6-2.]  In Class 35, Plaintiff's FORMA.AI mark  coexists with FORMA (Reg. No. 6721764) for "consulting services in the fields of business organization and management" and FORMA TAX (Reg. No.) for "business information and accounting advisory services."  [SOF, ¶ 90.]

There are also users whose marks include FORMA and who offer HR consulting or "HR Tech" products and services.  One of HR's duties is to train employees.  SCIFORMA, DIGIFORMA, FORMA, FORMA LEADERS, and FORMA LMS all offer some version of employee training (either through consultation, training software, or a combination thereof).  BPMobile's FORMA pdf editor can be used to fill out forms, to include forms that HR departments utilize.  FLOWFORMA is used for HR process automation.  INFORMACAST allows a workplace to send alerts to employees about office closures (something HR usually handles).  FORMA VISION offers teleconference software; HR departments engage in Internet-based teleconferences.  [SOF, ¶¶ 94-104.]  That these users all co-exist with Plaintiff under names that include FORMA suggests FORMA is a weak mark.

### 3.  Plaintiff failed to provide evidence of substantial commercial use of FORMA.AI.

Plaintiff conceded that its FORMA.AI mark is not in widespread use.  [SOF ¶ 55.]  The evidence provided by Plaintiff in discovery supports this concession.  With regard to three of the commercial strength factors – consumer studies, Defendant's intent, and length and exclusivity of use – there is no evidence.  Plaintiff did not provide any consumer studies.  As Defendant did not know Plaintiff existed when selecting its new name, Defendant could not have attempted to

14

plagiarize the mark.  As seen above, Plaintiff is not the exclusive user of the string 'forma' used as part of marks in the HR Tech space.

The remaining factors show only small amounts of commercial use.  With regard to unsolicited media coverage, Plaintiff identified only a handful of articles.  Regarding sales under the mark, Plaintiff has approximately 23 customers in the United States.  [SOF, ¶ 45.] Statistically, that is less than one per state.  Turning to advertising expenditures, since September 2016, Plaintiff spent less than $5 million on advertising in the United States and approximately 1/3 of those costs were spent paying employees.  [SOF, ¶ 53.]  Plaintiff does not engage in substantial commercial use in the United States.  This further weighs against the strength of the mark.

In light of the foregoing, the only conclusion a reasonable jury could reach is that FORMA.AI is a weak mark.  This factor weighs against finding a likelihood of confusion.

### B. The only similarity between the two marks is the word "forma"

"In testing for similarity" of the marks, the allegedly infringing use must be examined "in the context in which it is seen by the ordinary consumer."  *Grayson O,* 856 F.3d at 317. Therefore, marks must be analyzed in their entirety and in the context of how they are actually used in commerce. To determine whether mark usage results in a likelihood of confusion, "we must examine the allegedly infringing use in the context in which it is seen by the ordinary consumer." *Anheuser-Busch, Inc. v L&L Wings, Inc.*, 962 F.2d at 316, 319 (4th Cir. 1992).

Marks are compared in terms of "whether there exists a similarity in sight, sound, and meaning which would result in confusion."  *George & Co,* 575 F.3d at 396.   This includes considering the "style, color, [and] presentation of the marks."  *Grayson O,* 856 F.3d at 317. Indeed, even when marks contain the same dominant term, the use of different fonts, colors, and

15

artistic elements can render marks different. *Id.* (marks found to be different despite each containing '450'; even if 450 was dominant, the differences in font, color, and artistic elements rendered the marks distinguishable). Further, unless products and services are sold through the same stores and therefore would appear side by side on a shelf (or webpage), "relying solely on a side-by-side comparison of the marks to determine the likelihood of confusion would be inappropriate." *Grayson O,* 856 F.3d at 317.

### 1. Plaintiff's and Defendant's marks, as used in the market, are distinguishable.

Plaintiff and Defendant each use logo marks for their respective products and services. Plaintiff's logo mark is shown below, left; Defendant's logo mark is shown below, right.

| Plaintiff | Defendant |
|---|---|
|  |  |

Plaintiff's logo includes a 3-dimensional F in white and purple, followed by "FORMA.AI" in all capital letters. Defendant's logo involves a geometric shape comprised of blue, red, pink, and yellow circles followed by "forma" in all lowercase letters. While Defendant concedes that both parties include the string "forma," the marks in their entirety are distinguishable.

### 2. The string "forma" is commonly used in the HR Tech marketplace.

It is well accepted that widespread use of an element as part of a trademark is evidence that "the public would readily distinguish the differences" between marks incorporating that element and that confusion is not likely. *King Candy Co. v. Eunice King's Kitchen, Inc.*, 496 F.2d 1400, 1401 (C.C.P.A. 1974). When consumers see an element commonly used in a mark to offer a type of service, they look to the other portions of the mark to distinguish the source of the product or service. When there is substantial third-party use of a mark element, consumers give great weight to the other portions of the mark and are not likely to be confused by the inclusion

of the widely used, common element. *Care First of Md, Inc. v. FirstHealth of the Carolinas, Inc.*, 77 U.S.P.Q.1492, 1509 (T.T.A.B. 2005), *aff'd*, 479 F.3d 825 (Fed. Cir. 2007) (third party use mitigates against confusion); *In re Broadway Chicken, Inc.*, 38 U.S.P.Q.2d 1559, 1565-66 (T.T.A.B. 1996) (no likelihood of confusion between two restaurants whose marks started with BROADWAY due to large number of third-party users).

As discussed above, Plaintiff claims that the relevant market is "HR Tech," which contains many FORMA users. Registered FORMA users co-exist on the Principal Register at the USPTO with Plaintiff. For example, FORMA TAX provides records management, business administration, and payroll preparation, processing, and administration services; PERFORMA covers software for managers of investment funds for use in financial portfolio management; INFORMA is registered for providing insurance consulting, insurance information and financial investment advice; and PERFORMA LABS covers employment training for police, first responders, and military professional. There is even a registration for FORMA that covers "consulting services in the field of business organization and management," which implicitly includes consulting regarding HR organization and management. [SOF, ¶ 90.] Nonetheless, the USPTO did not cite any of these marks against Plaintiff's application that became its registration for FORMA.AI. [SOF, ¶ 61.]

Non-registered users also offer technology used by HR departments. Examples include FORMA LMS, DIGIFORMA, and SCIFORMA, which provide corporate training software; FLOWFORMA for HR automation software; and INFORMACAST for software that allows a company to send alerts to its employees (e.g. an office closing due to inclement weather). [SOF, ¶¶ 94-104.] These users are also co-existing with Plaintiff in the "HR Tech" marketplace, despite including "FORMA" in their names.

Given the substantial third-party use of "FORMA," consumers in the HR Tech space are conditioned to look to other portions of these marks to distinguish between the users. The non-FORMA portions of Plaintiff's and Defendant's marks are unique and do not bear any resemblance. Consumers who can distinguish between Plaintiff and the other FORMA users in the HR Tech space can also distinguish between Plaintiff and Defendant. This factor therefore weighs in favor of Defendant.

**C. Plaintiff and Defendant do not offer identical products and services.**

Plaintiff offers an artificial intelligence based software platform for the sales performance and compensation management industry. [D.6, ¶ 7; D.6-2.] Defendant offers computer software platforms for companies to use to offer personalized employee benefits, healthcare benefits, insurance benefits and lifestyle benefits to employees. [SOF, ¶ 3.] Plaintiff's software and Defendant's software are different. Even Plaintiff's expert agrees. [SOF, ¶ 4.]

The parties disagree as to whether their goods and services are related. Plaintiff asserts that all "HR Tech" is considered related goods and services. In other words, under Plaintiff's understanding of related goods and services, sales compensation software is related to software used to train corporate employees as both are "any technology that supports and enables the human resources within a business." [SOF, ¶ 44.] Defendant asserts that related goods and services are limited to "employee benefits" products and services. While Defendant maintains its position that the parties' software is not related, for purposes of this motion, Defendant uses Plaintiff's definition as to the scope of related products and services. As such, for purposes of this motion, this factor would somewhat favor Plaintiff, as the goods and services would not be identical but would have a relationship.

18

**D. The parties use different facilities in their businesses.**

Likelihood of confusion may be influenced by the type of facilities used by the parties. To determine whether the type of facilities are similar or dissimilar, courts look at the parties' distribution modes for their products. *Swatch AG v. Beehive Wholesale, LLC*, 739 F.3d 150, 160 (4th Cir 2014). When parties primarily use different modes of distribution, this factor weighs against finding a similarity of facilities. *Id*. at 160-161. Minimal overlap in sales in insufficient to show the parties use similar facilities. *Id*.

Similarly, the mere fact that "both parties use web pages and articles republished on third-party websites" is insufficient to show the facilities used by the businesses are similar. *United States Conf. of Catholic Bishops v. Media Research Ctr.,* 432 F. Supp. 2d 616, 627-628 (E.D. Va. 2006); *see also Louis Vuitton Malletier S.A. v. Haute Diggity Dog LLC*, 507 F.3d 252, 262-263 (4th Cir. 2007) (finding products not sold through the same facilities despite both parties' products being sold on the Internet when sales were made through different websites). Indeed, the "parties' facilities and channels of trade are sufficiently dissimilar" when the overlap is 'the Internet.' *United States Conf. of Catholic Bishops*, 432 F. Supp. at 627 *citing Yellowbrix, Inc. v. Yellowbrick Sol., Inc.,* 181 F. Supp. 2d 575, 579 (E.D.N.C. 2001).

Defendant's services are predominantly sold through employee benefits brokers. Between 70% and 90% of Defendant's sales come through employee benefits brokers. An employee benefits broker is an intermediary who negotiates with employee benefits providers on behalf of the broker's clients, and who provides their client-companies with recommendations on employee benefits products and services the company should provide to its employees. [SOF, ¶¶ 5-8.] There is no evidence that Plaintiff sells its product through employee benefits brokers.

Meanwhile, "Plaintiff's software platform is primarily offered [and] sold…online. The Internet is the relevant channel of trade." [SOF, ¶ 57.] Plaintiff means it sells its software through its website, www.forma.ai. The only online source identified in Plaintiff's discovery responses through which Plaintiff's products and services are available for purchase is Plaintiff's website. Defendant does not sell its software through www.forma.ai.

The only overlap between the parties' facilities is, arguably, that both parties sell through their respective Internet webpages. Only a small number of direct sales of Defendant's products and services start with an inquiry through Defendant's website. [SOF, ¶ 9.] This is insufficient to show the parties use the same facilities.

Further, any user who encounters Defendant's website should be immediately aware that Defendant sells employee benefits services. The fact that Defendant sells employee benefits is arguably the most conspicuous item on Defendant's website. [SOF, ¶ 17.] In contrast, Plaintiff's website emphasizes that Plaintiff sells sales compensation products and services. [SOF, ¶ 57.] A user would need to actively not pay attention to the websites in order not to know what each party offers. Unsurprisingly, not a single incident of alleged actual confusion identified by Plaintiff is a potential purchase inquiry from a potential customer about one party's products or services submitted through the other party's website. [SOF, ¶¶ 65-87.]

Because the parties primarily use different facilities in selling and distributing their products and services, this factor favors Defendant. Indeed, the facilities are so separate that it is unlikely consumers seeking to purchase one party's products or services would encounter the other.

**E. The parties engage in different promotion and advertisement of their respective products and services.**

As with the facilities used by the parties, there is very little overlap between the parties' advertising. While both parties utilize the Internet in their advertising, they advertise in different online locations.

The quantitative majority of Defendant's online advertising is done through industry portals for employee benefits brokers. These are third party Internet sites that are run by the broker industry. Examples include Shortlister, BenefitPitch, and MercerVIP. [SOF, ¶¶ 14-15.] There is no evidence that Plaintiff advertises on employee benefits broker portals.

Plaintiff, meanwhile, "primarily advertises and promotes its services under [FORMA.AI] in the United States via its www.forma.ai website." [SOF, ¶ 49.] Defendant does not advertise its services on www.forma.ai.

Beyond their primary methods of advertising, both parties do have a presence on some of the same broad platforms. For example, both businesses use the social media platform LinkedIn. LinkedIn, however, has 900 million users worldwide, with approximately 200 million in the United States. Oleksii Bondar, "Important LinkedIn Statistics Data & Trends," available at https://www.linkedin.com/pulse/important-linkedin-statistics-data-trends-oleksii-bondar-pqlie/ (December 22, 2023). There are over 58.4 million companies who maintain a LinkedIn page. *Id*. LinkedIn has become nearly as ubiquitous as the Internet in general in regards of broad online locations for business promotion.

Although both parties are on LinkedIn, they appear to target different segments of the LinkedIn user base. Defendant's LinkedIn-related advertising is narrowly tailored so that it is directed to employee benefits brokers and professionals who work in the employee benefits space for their companies. Defendant's paid advertising is distributed to Defendant's target list,

21

which comprises approximately 600 accounts for brokers and benefits professionals that Defendant desires to see its advertisements. Defendant's unpaid LinkedIn Page is followed primarily by employee benefits brokers and the employee benefits professionals at companies. [SOF, ¶¶ 20-21.]

LinkedIn does not appear to be a significant portion of Plaintiff's advertising. Although Plaintiff produced a small number of LinkedIn advertisements and testified that it does some paid and unpaid advertising on LinkedIn, Plaintiff failed to provide evidence in discovery that its LinkedIn advertisements are routinely targeted at or seen by employee benefits brokers or professionals who work in the employee benefit space. Plaintiff has not identified a single advertisement that was targeted specifically to employee benefits professionals. Further, a review of Plaintiff's LinkedIn advertisements makes clear they are all about sales compensation, not employee benefits. [SOF, ¶ 50.]

The parties primarily advertise and promote their products and services through different channels. The quantitative majority of Defendant's advertisement occurs through industry portals for employee benefits brokers. Plaintiff does not advertise on those portals. Plaintiff, meanwhile, predominantly uses its website. Defendant does not advertise on Plaintiff's website. Any overlap on any other website would be minimal. The channels of advertising favors the Defendant.

### F. Defendant did not know Plaintiff existed when Defendant adopted its FORMA mark.

Defendant did not adopt its FORMA name and logo with any knowledge of Plaintiff. Defendant did not even come up with the name FORMA. Instead, Defendant hired a branding firm, Landscape, to help it select a new name. The name FORMA was developed by Landscape and presented to Defendant as one of many options for Defendant's new name. Prior to adopting

the name FORMA, Defendant even involved a lawyer. [SOF, ¶¶ 30-36.] Plaintiff, however, did not have any active application or registration at the USPTO at that time. Plaintiff only filed an application for the first time after Defendant's application was filed. [SOF, ¶ 60.] Thus, Defendant could not have found Plaintiff at the USPTO prior to filing its application.

After Plaintiff wrote to Defendant and Defendant learned of Plaintiff, Defendant continued to believe that there was not a likelihood of confusion. Defendant targets a different segment of the market than Plaintiff and both parties co-exist with other FORMA users in the broader HR space. Defendant's trademark lawyer even sent a letter to Plaintiff in this regard. [SOF, ¶¶ 89-104; D.6-7.]

Defendant's belief that there is no likelihood of confusion is more than reasonable. When a US Trademark Examiner conducted a search on *Plaintiff's* application that matured to registration, Defendant's application was already pending. Nonetheless, the examiner asserted no marks were found that were likely to be confused with Plaintiff's application. [SOF, ¶ 61.]

There is no evidence Defendant intended to copy Plaintiff. This factor weighs in favor of Defendant.

### G. The parties' products are purchased by sophisticated consumers.

"Although no one factor is dispositive of the 'likelihood of confusion' inquiry, the sophistication and expertise of the usual purchasers can preclude any likelihood of confusion among them stemming from the similarity of trade names." *Perini Corp. v. Perini Constr., Inc.*, 915 F.2d 121, 127 (4th Cir. 1990); *see also George & Co.,* 575 F.3d at 393 (likelihood of confusion can turn on the sophistication of consumers). Sales that involve multiple meetings that are "tailored to the customer and the product" are purchases that are "'unusual and complex' and made with 'care and deliberation' after researching the products." *CDOC, Inc. v. Liberty*

*Bankers Life Ins. Co.,* 844 Fed. Appx. 357, 359 (Fed. Cir. 2021) (finding purchasers of insurance to be discerning purchasers).

Sophisticated consumers purchase both Plaintiff's and Defendant's products and services through sophisticated purchasing processes. Plaintiff's customers are large, multi-national companies with a sales force. The purchasing process involves meetings and investigations before a company purchases Plaintiff's products and services. The key decision makers are C-suite officers, such as the CEO, CHRO, or CFO. [SOF, ¶¶ 48, 58.] Plaintiff's customers are sophisticated business people – the leaders of some of the largest companies in the world. Plaintiff's products are purchased by these business leaders after a long, in depth sales process with multiple meetings. These are discerning consumers engaging in a sophisticated purchase.

Defendant sells its products or services to other businesses. Defendant's products and services are typically sold through employee benefits brokers – specialists in employee benefits who are hired by companies to help that company create an employee benefits program. The professionals at the ultimate customer companies who decide to purchase Defendant's products are business officers who focus on employee benefits. Defendant spends months presenting and promoting its products and services to a potential company customer before the sale occurs. [SOF, ¶¶ 5-10.] Defendant also sells its products and services to a sophisticated consumer as part of a sophisticated purchasing process. The sophistication of the purchaser, as well as the sophistication of the purchasing process, weighs heavily against finding a likelihood of confusion.

### H. Plaintiff failed to demonstrate actual confusion.

**1. Even if every instance Plaintiff asserts as actual confusion was actual confusion (which it is not), such confusion would be *de minimus*.**

24

"While a showing of actual confusion is not required to establish infringement, an absence of actual confusion, or a negligible amount of it, between two products after a long period of coexistence on the market is highly probative in showing that little likelihood of confusion exists." *Aktiebolaget Electrolux v. Amratron Int'l, Inc.*, 999 F.2d 1, 4 (1st Cir. 1993) (little actual confusion over six years weighed heavily against likelihood of confusion). Indeed, "the 'absence of any evidence of actual confusion over a substantial period of time creates a strong inference that there is no likelihood of confusion.'" *Swatch AG v. Beehive Wholesale LLC,* 739 F.3d 150, 162 (4th Cir. 2014) (quoting *CareFirst,* 434 F.3d at 269).

*De minimis* confusion is a lack of actual confusion. *CareFirst*, 434 F.3d at 268 (*de minimis* confusion does not prove actual confusion; "…a confusion rate of 2 percent [is] hardly a sufficient showing of actual confusion."); *Sunbeam Corp. v. Equity Indus., Corp.*, 635 F. Supp. 625, 635 (E.D. Va. 1986), *aff'd* 811 F.2d 1505 (4th Cir. 1987) (granting summary judgment in favor of defendant when 1.4% confused); *IDV N. Am., Inc. v. S&M Brands, Inc.,* 26 F. Supp. 2d 815, 832 (E.D. Va. 1998) (2.4% confusion "prove[s] the absence, rather than the presence, of likely confusion"; dismissing suit); McCarthy, § 32:189 (confusion less than 10% evidence of no likelihood of confusion). *1-800 Contacts, Inc. v. Lens.com, Inc.,* 722 F.3d 1229, 1244 (10th Cir. 2013) (values indicating *de minimis* confusion in this context are "insufficient to justify relief"; confusion that was at most 1.5% insufficient). A plaintiff's "failure to uncover more than a few instances of actual confusion creates a presumption against likelihood of confusion in the future." *George & Co.,* 575 F.3d at 399. To determine whether actual confusion is *de minimis*, the "evidence of the number of instances of actual confusion must be placed against the background of the number of opportunities for confusion*." George & Co.,* 575 F.3d at 398

*quoting* Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition,* § 23:14.; *accord Petro Stopping,* 130 F.3d at 95.

Plaintiff identified approximately 29 occurrences that it asserted were instances of actual confusion. [SOF, ¶ 65.] The majority of these occurrences involve emails sent to Plaintiff that were allegedly intended for Defendant. [SOF, ¶¶ 71-83.] During the same time period, Defendant received 420,672 emails. [SOF, ¶ 84.] Even if all 29 incidents were truly actual confusion (which they are not), they amount to 0.007% of email communications intended for Defendant. This number does not consider the amount of emails Plaintiff usually receives, the volume of social media tags either party receives, or the volume of phone calls either party receives, which would serve to make the percentage of actual confusion even smaller. Even if every instance Plaintiff asserts is actual confusion was, in fact, a case of confusion, those instances would be *de minimis*. This factor strongly favors Defendants.

### 2. None of the instances of confusion are from actual purchasers of Defendant's products and services.

When considering whether actual confusion exists, the focus is on confused *consumers*. *See, e.g., Perini Corp. v. Perini Constr., Inc*., 915 F.2d 121, 127 (4th Cir. 1990) (asking whether there is "a likelihood that an appreciable number of *purchasers* will be misled or simply confused as to the source of the goods and services in question") (emphasis added). As discussed above, both Plaintiff's and Defendant's products are purchased by officers of a company with purchasing power. [SOF, ¶¶ 10, 58.] The alleged instances of confusion, however, came from either end users of Defendant's product (employees of the company that is Defendant's customer) or third parties who do not appear to be potential purchasers. Plaintiff has not identified a single purchaser who was allegedly confused. [SOF, ¶ 67.] This further weighs in favor of Defendants.

**CONCLUSION**

In light of the foregoing, Plaintiff cannot show a likelihood of confusion. As likelihood of confusion is a required element in each of Plaintiff's claims, this court should enter summary judgment in favor of Defendant.

Respectfully submitted this the 9th day of August, 2024.

By:     */s/ Emily M. Haas*
        Emily M. Haas
        NC State Bar No. 39,716
        4509 Creedmoor Road, Suite 501
        Raleigh, North Carolina 27612
        Telephone: (984) 220-8750
        Facsimile:  (877) 398-5240
        Email: emhaas@michaelbest.com

        *Attorney for Twic, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that on this the 9th day of August, 2024 a true copy of the foregoing **DEFENDANT's MEMORANDUM IN SUPPORT OF ITS PARTIAL MOTION FOR SUMMARY JUDGMENT ON LIKELIHOOD OF CONFUSION** was filed with the clerk of court using the CM/ECF system, which will send notification by electronic mail of such filing to all counsel of record.

By:     */s/ Emily M. Haas*
Emily M. Haas
NC State Bar No. 39,716
4509 Creedmoor Road, Suite 501
Raleigh, North Carolina 27612
Telephone: (984) 220-8750
Facsimile:  (877) 398-5240
Email: emhaas@michaelbest.com

*Attorney for Twic, Inc.*