**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF NORTH CAROLINA**
**WESTERN DIVISION**
**Civil File No.: 4:23-cv-77**

| | | |
|---|---|---|
| **FORMA AI INC.,** | ) | |
|     **Plaintiff,** | ) | **DEFENDANT's REPLY IN SUPPORT OF ITS** |
| | ) | **PARTIAL MOTION FOR SUMMARY** |
|     **v.** | ) | **JUDGMENT ON LIKELIHOOD OF** |
| | ) | **CONFUSION** |
| **TWIC, INC.,** | ) | |
|     **Defendants.** | ) | |

The facts are not genuinely in dispute. No reasonable consumer of either Plaintiff's or Defendant's services is likely to be confused. Despite spending dozens of pages responding to Defendant's motion for summary judgment on the issue of likelihood of confusion, Plaintiff failed to put forth a genuine issue of material fact that would prevent summary judgment. Although Plaintiff had more than two years to locate facts for its assertion that confusion is likely, Plaintiff did not provide significantly probative facts to oppose Defendant's motion. Instead, Plaintiff relied on conjecture, opinion, belief, word games, and conclusory statements. Summary judgment is the time for facts – not for Plaintiff's unsupported theories – and judgment should now be entered in favor of Defendant.

The purpose of summary judgment is to save the time and expense of trial when there is no genuine issue of material fact and additional evidence beyond that available in the motion for summary judgment could not reasonably be expected to change the result. *Pure Gold, Inc. v. Syntex (U.S.A.), Inc*., 739 F.2d 624, 627 (Fed. Cir. 1984). Not every dispute about material facts is genuine. Colorable evidence or evidence not significantly probative does not create a genuine issue of fact. *See Anderson v. Liberty Lobby Inc*., 477 U.S. 242, 249-50 (1986). "Genuineness means that the evidence must create fair doubt; wholly speculative assertions will not suffice. A trial, after all, is not an entitlement. It exists to resolve what reasonable minds would recognize

as real factual disputes." *Ross v. Comm'n Satellite Corp.*, 759 F.2d 355, 364 (4th Cir. 1985), *abrogated on other grounds by Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989); *see also The News and Observer Publ'g Co. v. Raleigh-Durham Airport Authority*, 597 F.3d 570, 576 (4th Cir. 2010) (to show a genuine issue of material fact, nonmoving party must set out specific facts and may not rely upon allegations or denials in its pleadings). The Court is obligated to prevent factually unsupported claims and defenses from going to trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986); *accord Pure Gold, Inc.*, 739 F.2d at 624.

Turning to the *Pizzeria Uno* factors,[1] there is no genuine issue of material fact. With regard to the parties' marks, Plaintiff does not deny that it uses the logo shown below left. [D.48, ¶47, 57.] Plaintiff admits that Defendant uses the logo shown below right. [D.48, ¶31.]

 

The only similarity is that both include the string f-o-r-m-a.

There is nothing unique about the string f-o-r-m-a. Plaintiff concedes that there are at least 25 registrations or allowed applications for software marks that include the string f-o-r-m-a, and 10 registrations or allowed applications for business technology or consulting marks that include the string f-o-r-m-a. [D.48, ¶90.] Plaintiff does not dispute the existence of the webpages showing uses of SCIFORMA, DIGIFORMA, FORMA (by Forma Life Science Marketing), FORMA LEADERS, FLOWFORMA, "FORMA: AI PDF Editor & Creator," PERFORMA APPS, INFORMACAST, FORMA VISION, FORMA LMS, or FORMA (by Forma Consultants). [D.48, ¶¶94-104.] While Plaintiff attempts to argue that these marks are

---

[1] *Pizzeria Uno Corp. v. Temple*, 747 F.2d 1522 (4th Cir. 1984).

not really FORMA marks, there is no question that each of these third party marks includes f-o-r-m-a.

It is true that both Plaintiff and Defendant include f-o-r-m-a in their marks, but those marks, taken in their entireties, are distinguishable. Any juror looking at these logos would easily see that the marks use different artistic elements, different fonts, and different cases.

Plaintiff suggests that a comparison of the marks should not be limited to how Plaintiff uses its mark in commerce because Plaintiff has a word mark registration. The Fourth Circuit disagrees. The likelihood of confusion test in this Circuit is how the parties use their marks *in commerce*. *Grayson O Co. v. Agadir International, LLC*, 856 F.3d 307, 317 (4th Cir. 2017); *Anheuser-Busch, Inc. v L&L Wings, Inc.*, 962 F.2d at 316, 319 (4th Cir. 1992).

There is no question as to the logos the parties use in commerce. A reasonable juror, viewing these logos, would recognize that the marks have some similar elements, but are distinguishable as a whole. There is no question of fact with regard to the similarity of the parties' marks.

There is no question that Plaintiff's mark is not strong. The duty to show the strength of its mark is on Plaintiff. Plaintiff, however, did not produce any consumer studies showing the alleged strength of its mark. Plaintiff does not deny that, from September 2016 through February 2024, 

. [D.48, ¶53.]

. As discussed below, there is no question Defendant did not intend to violate any right of Plaintiff .

Plaintiff asserts there is a question of fact regarding strength because its vice president submitted a conclusory declaration with his opinion that Plaintiff's mark is strong. Plaintiff did not provide any documentary support for that opinion. Mr. Buchanan's opinion is the type of submission that courts routinely find does not give rise to a genuine issue of material fact. There is no question; Plaintiff failed to demonstrate its mark is strong.

That there is third party use also cuts against the strength of Plaintiff's mark. Plaintiff claims that none of the third party marks are actually third party use, relying on its word games at deposition with Defendant. There, Plaintiff tried to paint Defendant as in a larger market (HR Space), while ignoring how Defendant attempted to distinguish between how the HR Space is made of smaller markets. Indeed, Defendant provided clarifying testimony that its market is the employees benefits subsection of the HR market. [D.41, ¶ 14.] If Plaintiff wants the market to be the entire HR Space, that would capture these third parties. If, however, Plaintiff wants the market to be the employee benefits market space – the space to which Defendant testified it was in -then Plaintiff, like those third parties, offer unrelated services. Plaintiff cannot have it both ways. Either the market is the HR Space, with both Plaintiff and Defendant but where the third parties dilute Plaintiff's mark, or the market is the subsections of the HR Space, in which case Plaintiff and Defendant are in different spaces.

There is, however, no question as to what the parties offer under their respective marks. Defendant provides software for the management and customization of employee benefits. [D.48, ¶1.] Defendant's software allows companies to customize their employee benefits plans by offering Lifestyle Spending Accounts (LSAs), Health Reimbursement Accounts (HRAs), Health Savings Accounts (HSAs), and Flexible Spending Accounts (FSAs). [D.48, ¶3.] Defendant does not sell products or services outside the employee benefits space. In particular,

Defendant does not sell sales compensation products or services. [D.48, ¶4.] Plaintiff concedes these facts.

Plaintiff seeks "to build an enduring company that solve[s] sales performance management." [D.48, ¶37.] Plaintiff does so by providing business consulting services with regards to sales performance, business collaboration services in the fields of sales performance management, sales compensation management, and technology selection; and SaaS software services for sales performance and compensation management. [*Id*.] These facts are not in dispute.

There is no unbiased evidence to suggest that Plaintiff's and Defendant's products are the same or competitive. Indeed, the unbiased evidence all finds Plaintiff's and Defendant's products are sufficiently distinct. The USPTO *registered* Plaintiff's mark despite Defendant having an earlier-filed application for its FORMA logo on file. [D.6-2.] When identifying its competitors, Plaintiff lists a number of companies; none are Defendant. [D.48, ¶59] Even *Plaintiff's* expert testified that Plaintiff's products and Defendant's products are not directly competitive. [Rogers Depo., pp. 16-17.]

The only evidence in support of Plaintiff's claims that the parties' goods and services are competitive is (1) the opinion of Plaintiff's vice president; and (2) a previously undisclosed office action for an intent-to-use application that is directed to different services (namely Class 41 services) than those at issue in this case. The former is insufficient to overcome the substantial non-biased evidence showing the parties' services are different. The latter is irrelevant, as it applies to different services that were being offered under Plaintiff's mark at the time Defendant changed its name. It should also be excluded for its failure to be timely produced. There is no genuine question of material fact.

5

Plaintiff admits that its primary channel of trade is its www.forma.ai website. [D.48, ¶49, 57.] There is no question that Defendant does not sell its services on Plaintiff's website. Plaintiff admits that Defendant, meanwhile, primarily sells its services through employee benefits brokers. [D.48, ¶5-8.]

For the first time, months after the close of discovery, Plaintiff's vice president submitted a declaration of conclusory statements asserting that Plaintiff also sells through employee benefits brokers. As an initial matter, an unsupported conclusory statement by Plaintiff's vice president is not probative evidence. There is not one document cited to support these assertions. This is not sufficient to raise a genuine question as to whether Plaintiff and Defendant sell through the same channels. Further, even if these allegations could be evidence, their disclosure only when Plaintiff responded to a summary judgment motion makes them untimely. They should be excluded for failure to comply with Fed. R. Civ. P. 26(e).[2]

Even when a company considers either Plaintiff or Defendant's services, they undergo a complex process prior to purchasing either party's services. Plaintiff admits that companies interested in Defendant's services interact over multiple meetings and multiple months prior to purchasing Defendant's services. [D.48, ¶10.] Plaintiff admits that its typical sales process is also complex with multiple meetings over a period of time. [D.48, ¶58.] There is no question these are sophisticated purchases. Similarly, there is no question that the individuals involved in deciding to purchase Plaintiff's and Defendant's services are accomplished business executives. [D.48, ¶¶ 10, 58.] There can be no reasonable dispute that these are complex purchases involving sophisticated, careful purchasers.

---

[2] Defendant will be requesting Plaintiff withdraw this and other untimely disclosed material and, if Plaintiff refuses, filing a motion to strike.

There is also no question that the parties' channels for advertising are different.  Plaintiff admits that its primary source of advertising is its www.forma.ai website.  [D.48, ¶49, 57.] There is no question that Defendant does not advertise on Plaintiff's website.

Plaintiff admits that it sends targeted marketing communications to a predetermined list that identified the stakeholders who are responsible for sales performance management in their companies.  [D.48, ¶56.]  Plaintiff concedes that Defendant does not sell sales compensation products or services, and does not sell products or services outside the employee benefit space. [D.48, ¶4.]  Defendant, thus, has no reason to communicate with stakeholders who are responsible for a company's sales performance management.

Plaintiff admits that its Google advertisements include "Sales Commission," "Sales Compensation," or "Compensation" with "SPM" in the headlines of those advertisements. [D.48, ¶50.]  Defendant does not use Google advertisements; past experiments with Google advertisements indicated that paid advertisements on Google were not good at generating leads. [D.30-2 ¶¶ 23-24.]  Plaintiff failed to identify a single instance during the time Defendant did advertise on Google where Plaintiff's advertisements and Defendant's advertisements were simultaneously displayed.

Plaintiff admits that its paid advertising on LinkedIn includes the terms "Sales Compensation," "CompOps," or "RevOps" and that none mention employee benefits.  [D.48, ¶50.]  Plaintiff also admits that Defendant uses account-based marketing on LinkedIn.  [D.48, ¶20.]  Defendant's target list is for employee benefits brokers and professionals[3] [*id.*], not sales compensations professionals or revenue operations professionals.[4]

---

[3] Plaintiff complains because it made an assumption as to what the term "company" means and now objects that Plaintiff's assumption may have been incorrect.
[4] "CompOps" is shorthand for Compensation Operations and refers to automating sales compensation operations.  "Sales Comp 2.0: The Future of Sales Compensation," FORMA.AI, available at

Quite simply, Defendant does not advertise on Plaintiff's primary channel for promotion. In the extremely large, ubiquitous spaces where both are or have been located, the parties' respective advertisements are targeted to different segments of users. There is no question of material fact.

There is no question of reasonable fact that Defendant did not know of Plaintiff when it selected and began using the FORMA name. Plaintiff concedes that Defendant hired a branding company that proposed over 30 potential candidates for a new name, that the FORMA name was one of those suggested by the branding company, and that Defendant hired an attorney to help it assess the final name candidates and file a trademark application. [D.48, ¶30-32.] Defendant testified that it did not know of Plaintiff until Plaintiff initiated this dispute. [D.30-2, ¶33; D.30-3, ¶12; D.30-1, ¶40.]

Although Defendant testified it did not know of Plaintiff when it adopted and initiated use of its FORMA brand, Plaintiff nonetheless "disputes" this. Plaintiff does not provide any actual evidence to support its dispute. Instead, Plaintiff provides conspiracy theories. For example, Plaintiff suggests that because Plaintiff and Defendant know Mr. Landis, Defendant must have known about Plaintiff. [D.48, ¶36.] Mr. Landis, however, has not testified that he told Defendant of Plaintiff prior to March 8, 2022. Defendant testified it was not aware of Plaintiff prior to March 8, 2022. [D.30-2, ¶33; D.30-3, ¶12; D.30-1, ¶40.] Plaintiff suggests that, because Defendant previously had a .ai URL, Defendant should have known Plaintiff used www.forma.ai. [D.48, ¶36.] Plaintiff does not provide any documentary evidence or testimony

https://www.forma.ai/resources/article/sales-comp-2-0-the-future-of-sales-compensation (Oct. 13, 2023). RevOps means "RevenueOperations." "RevOps' job is to facilitate communication between all revenue-generating teams, implement new tools, and improve reaching sales goals." "What is Revenue Operations (RevOps)?," COGNISM, available at https://www.cognism.com/what-is-revenue-operations (last accessed Sept. 19, 2024).

that refutes the sworn testimony from Defendant that Defendant did not know of Plaintiff prior to March 8, 2022.  [D.48, ¶36; D.30-2, ¶33; D.30-3, ¶12; D.30-1, ¶40.]  Plaintiff points to a Google search performed after Defendant adopted its new name, but none before.  [D.48, ¶36.]  Plaintiff provides no evidence to dispute the testimony that Defendant had no knowledge of Plaintiff prior to adopting and beginning use of its name.  Conjecture of ways Defendant *could have* learned of Plaintiff do not amount to evidence as to how Defendant actually learned of Plaintiff (Plaintiff sending a cease and desist letter to Defendant). [D.30-1, ¶40.]  Plaintiff failed to raise a genuine question of fact.  Defendant did not intend to infringe any right of Plaintiff.

There is finally no question that any actual confusion is *de minimis*.  In its brief and its response to Defendant's statement of facts, Plaintiff raises a number of theories, misconstrues evidence, relies on hearsay, and puts forth unfounded accusations in attempting to avoid this reality.  While Defendant disagrees with Plaintiff on those issues, that disagreement is irrelevant. Ultimately, the question of actual confusion comes down to this: Even if all of Plaintiff's assertions of incidents that could be actual confusion are counted as actual confusion, the confusion is *de minimis*.

Plaintiff concedes less than thirty possible instances occurred over two and a half years. [D.48, ¶117.]  Plaintiff claims its customers have more than 500 employees or sales teams of more than 100 people.  [D.48, ¶107.]  Plaintiff claims there are thousands of companies that are potential clients for Plaintiff.  [D.48, ¶110.]  Despite all these potential points of contact for "confusion" to occur, Plaintiff can point to less than thirty occurrences over 2.5 years.

Defendant received over four hundred thousand emails from users of Defendant's platform or from potential customers since Defendant changed its name.  [D.30-1, ¶ 41.] Plaintiff tries to suggest this data set comes from a different data set than the values for emails

provided earlier in discovery. [D.48, ¶84.] The updated email count is for the same set of addresses as of the final month of discovery; more time passed, so more emails were sent. There is nothing nefarious about communications increasing as time progresses.

Plaintiff suggests that the number of emails received by Defendant is not relevant to show *de minimis* confusion because some users emailed Defendant more than once. When counting instances of "actual confusion," however, Plaintiff treats multiple emails from the same sender as different occurrences (see, for example, Ms. Zarate). Plaintiff also argues that the numbers of emails received by Defendant should be related to the number of *customers* and not the number of *end users* when calculating *de minimis* confusion. Plaintiff, however, counted each and every one of its instances of confusion as separate instances – to include instances where multiple users from one company contacted Plaintiff. Plaintiff cannot apply one standard for Defendant and one for Plaintiff. Applying Plaintiff's methodology in identifying what is considered an instance of actual confusion to what communications are an instance for calculating the total communication volume, the volume of relevant communications is at least 420,672. There is no question confusion is *de minimis*.

## CONCLUSION

There is no question of genuine fact. The parties agree on the relevant material facts. The Court may now apply the law to those facts and issue judgment as a matter of law. In light of the foregoing, the Court should grant Defendant's motion for summary judgment on likelihood of confusion.

Respectfully submitted this the 20th day of September, 2024.

By:    */s/ Emily M. Haas*
       Emily M. Haas
       NC State Bar No. 39,716
       4509 Creedmoor Road, Suite 501
       Raleigh, North Carolina 27612
       Telephone: (984) 220-8750
       Facsimile:  (877) 398-5240
       Email: emhaas@michaelbest.com

       *Attorney for Twic, Inc.*

11

## CERTIFICATE OF SERVICE

I hereby certify that on this the 20th day of September, 2024 a true copy of the foregoing **DEFENDANT's REPLY IN SUPPORT OF ITS PARTIAL MOTION FOR SUMMARY JUDGMENT ON LIKELIHOOD OF CONFUSION** was filed with the clerk of court using the CM/ECF system, which will send notification by electronic mail of such filing to all counsel of record.

By:     */s/ Emily M. Haas*
        Emily M. Haas
        NC State Bar No. 39,716
        4509 Creedmoor Road, Suite 501
        Raleigh, North Carolina 27612
        Telephone: (984) 220-8750
        Facsimile:  (877) 398-5240
        Email: emhaas@michaelbest.com

        *Attorney for Twic, Inc.*